**UNITED STATES of America**

v.

**Marvin MANDEL et al.**

**Crim. No. 75–0822.**

United States District Court,
D. Maryland.

Jan. 21, 1977.

Barnet D. Skolnik, Ronald S. Liebman, Daniel J. Hurson, Asst. U. S. Attys., Baltimore, Md., for the U. S.

Arnold M. Weiner, M. Albert Figinski, D. Christopher Ohly, Baltimore, Md., for defendant Mandel.

William G. Hundley, Carey M. Feldman, Washington, D.C., for defendant Hess.

Thomas C. Green, William W. Taylor, III, Washington, D.C., for defendant Harry Rodgers.

Michael E. Marr, Phillip M. Sutley, Susan Myerberg, Baltimore, Md., for defendant William Rodgers.

Joseph A. DePaul, College Park, Md., Charles G. Bernstein, Baltimore, Md., for defendant Cory.

Norman P. Ramsey, William F. Gately, Baltimore, Md., for defendant Kovens.

## MEMORANDUM

ROBERT L. TAYLOR, District Judge.

Defendants have filed a number of motions· and supporting memoranda since a mistrial was declared in this case on December 7, 1976. The Government has filed responses to each defense motion and has moved for a prompt retrial and a consolidation of the trial of defendant Kovens with the trial of the other defendants. The Court carefully examined the motions and briefs of all parties, and on January 12, 1977, heard oral arguments on all pending motions. On that date the Court issued an Oral Memorandum from the Bench concerning those motions and set a trial date of April 13, 1977. This Memorandum supplements the Memorandum issued from the Bench.

### History of the Case

A special grand jury for the District of Maryland returned a twenty-four count indictment on November 24, 1975, against Marvin Mandel (the present Governor of Maryland), Irvin Kovens, Ernest N. Cory, Jr., W. Dale Hess, Harry Rodgers, III, and William Rodgers. The defendants were charged with twenty counts of mail fraud under 18 U.S.C. § 1341, and various combinations of the defendants were charged in four separate counts with violating the anti-racketeering statutes, 18 U.S.C. § 1961 et seq.

The case originally was assigned to the Honorable Herbert F. Murray of the United States District Court for the District of Maryland. Arraignments were conducted on December 4, 1975, and each defendant entered a plea of not guilty. Judge Murray, in several comprehensive Memorandum Opinions, ruled on approximately twenty-five pretrial motions between December of 1975 and May of 1976. Judge Murray's rulings included, among other things, the dismissal of count 22 of the indictment and the striking of paragraph 12 of the indictment. A number of the motions presently before the Court are renewals of motions previously made before Judge Murray.

After a ruling by the Fourth Circuit Court of Appeals, the Honorable John H. Pratt of the United States District Court for the District of Columbia was designated to preside over the trial in Baltimore.[1] Judge Pratt ruled on several additional pretrial motions, some of which have recently

1. As noted by the Fourth Circuit Court of Appeals, Judge Murray's rulings remain as the law of the case. *In re Rodgers*, 537 F.2d 1196 (4th Cir. 1976).

been renewed. Trial began on September 8, 1976. Motions for judgment of acquittal were made at the close of the Government's proof by all defendants, and after hearing oral argument, Judge Pratt denied each motion. An unfortunate sequence of events, which will be discussed more fully herein, led to the declaration of a mistrial on December 7, 1976.

### Government's Motion for Prompt Retrial and Defendants' Motions for Continuance

■ The Speedy Trial Act provides in pertinent part that retrial following a mistrial "shall commence within sixty days from the date of [mistrial]." 18 U.S.C. § 3161(e). The Government has moved for a prompt retrial and has requested that the trial be scheduled to commence no later than February 5, 1977, which is sixty days from the date that the mistrial was declared. Defendants Mandel, Hess, and Harry Rodgers have resisted the Government's request for a prompt retrial and have moved for a continuance because, among other things, a reasonable delay is needed to permit the "air to clear" of publicity surrounding the previous trial, and defendant Mandel and many of the witnesses are scheduled to participate in the present session of the Maryland Legislature, which will adjourn on April 11, 1977. Defendants Cory and William Rodgers have joined in this motion. For the reasons stated below, the Court finds that the "ends of justice served" by scheduling the trial to commence on April 13, 1977, "outweigh the best interest of the public and the defendants" in having the trial commence on or before February 5, 1977. See 18 U.S.C. § 3161(h)(8)(A).[2]

The Court has been advised by counsel that as many as four members of the Maryland Legislature can be expected to be called as witnesses for both the Government and the defense on any given day of the trial. These officials were elected by the citizens of Maryland to serve them in government. The Court is of the opinion that the legislators cannot adequately serve the citizenship unless the Governor is present at the legislative session to confer with them from time to time. In addition, a trial date which would require legislators to be absent from the present session may serve to disrupt the legislative process. The Court agrees with those who contend that this case should be tried as soon as possible. However, the Court is of the opinion that it would be inappropriate to begin the trial before the Legislature adjourns. Accordingly, it is ORDERED that the trial be scheduled to commence on April 13, 1977, which is the second day after the Legislature adjourns.

A second reason exists for scheduling the trial to begin on April 13 rather than the February 5 trial date requested by the Government. As will be discussed below, several of the defendants contend that much of the publicity surrounding the first trial will dissipate if the trial is delayed for a reasonable time. The Court has examined many of the newspaper clippings and television and radio transcripts submitted by defendant Mandel. An April 13 trial date will result in a four month period between the date the mistrial was declared and the date of the retrial. In the opinion of the Court, it is likely that much of the publicity surrounding the first trial will dissipate during this time.

### Motion to Dismiss Indictment Because of Alleged Change of Theory

Defendant Mandel * has moved that the indictment be dismissed on the ground that the theory of the prosecution, insofar as it relates to the mail fraud counts, has under-

---

**2.** Section 3161(h)(8)(A) provides in pertinent part:

"Any period of delay resulting from a continuance granted . . . at the request of the defendant or his counsel . . . [shall be excluded in computing the time within which the trial must commence] if the judge granted the continuance on the basis of his findings that the ends of justice served by taking such action outweigh the best interest of the public and defendant in a speedy trial. . . ."

\* Defendant Hess has specifically joined in this motion.

gone a dramatic change since the time of indictment. Defendant contends that Judge Murray upheld the indictment on the ground that the alleged scheme to defraud consisted of bribery and the channeling of state business while the bribe was actively concealed. Defendant maintains that, as the trial progressed, the Government changed its theory to state that the mail fraud counts of the indictment did not require proof of bribery. The Government contends that it has not changed its theory, and "that this case is and always has been a mail fraud prosecution, instituted in accordance with the law which has evolved in recent years in the Seventh Circuit and elsewhere, and secondarily a prosecution alleging, within the limited context of the racketeering counts . . . bribery in addition to mail fraud."

Defendant cites, as support for his position, an excerpt from Judge Murray's Memorandum Opinion denying defendants' motions to dismiss the mail fraud counts of the indictment. This excerpt summarizes the "thrust" of the scheme to defraud and reads as follows:

"While the factual allegations in the indictment make the scheme appear to be a complex and subtle one, the thrust of the charges is simple. In essence, the indictment charges that the defendants devised a scheme to defraud the citizens and the state of Maryland by bribing the Governor to assist legislation which would be financially beneficial to the owners of Marlboro (and later Bowie), the identities of such owners being deliberately concealed from the public, the legislature and the Racing Commission by all the defendants. The indictment also charges that it was further a part of the scheme that defendant Mandel use his powers as Governor to channel state business to business entities in which defendants Hess, William A. and Harry W. Rodgers had financial interests, without revealing to the public or the governmental bodies involved his own business involvement with those defendants, including those interests in Security and Ray's Point which he had received from those

defendants as bribes, and the existence of which was actively concealed by defendants Mandel, Hess and William A. and Harry W. Rodgers."

*United States v. Mandel*, 415 F.Supp. 997, 1005 (D.Md.1976).

This summary was preceded by a lengthy outline, covering over two pages of the Court's reported opinion, of the scheme to defraud alleged in the indictment. *Id.* at 1003–05.

The Court's summary of the scheme to defraud must be read in the context of the entire Memorandum Opinion and the issues addressed therein. The challenge to the indictment did not involve the question of whether bribery was an essential component of the scheme to defraud. At issue was whether the indictment sufficiently charged an intentional use of false or fraudulent representations by defendants, and whether the scope of the mail fraud statute was limited to schemes to defraud resulting in economic harm. *Id.* at 1005.

■ The mail fraud statute prohibits the unlawful use of the mails in the execution of "*any* scheme to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations or promises . . . ." 18 U.S.C. § 1341. (emphasis added) There are two elements essential to the offense: (1) the intentional devising of a scheme to defraud, and (2) a use of the mails in its furtherance. *E.g., Pereira v. United States*, 347 U.S. 1, 74 S.Ct. 358, 98 L.Ed. 435 (1954); *Linden v. United States*, 254 F.2d 560 (4th Cir. 1958). Judge Murray held that the indictment sufficiently alleged these elements. *United States v. Mandel*, 415 F.Supp. 997 (D.Md. 1976). The present motions to dismiss must therefore be denied.

■ The jury is not required to adopt the theory of the Government or that of the defendants, and may base its verdict upon its own theory of the facts so long as that theory is supported by the law and the evidence. The Government, of course, cannot vary its proof from the facts alleged in the indictment to the extent that the de-

fendants would be tried on charges not made against them by the Grand Jury. *See Stirone v. United States,* 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960).

### Motion to Dismiss on Ground of Double Jeopardy

Defendants Harry and William Rodgers have moved that the indictment be dismissed on the ground that a retrial will place them in double jeopardy.** The thrust of their contention is that the mistrial is attributable to bad faith prosecutorial misconduct and overreaching. The Government contends that the circumstances which led to a mistrial were not attributable to its conduct, and that its conduct was appropriate under the circumstances and was undertaken in good faith to prevent the nonsequestered jury from being tainted by prejudicial publicity.

The parties have provided the Court with the material portions of the record and have represented to the Court the facts underlying the declaration of a mistrial. Although the basic facts are not in dispute, the conclusions to be drawn from them are sharply contested. On September 20, 1976, the first of two jury tampering attempts was made when a third party contacted counsel for defendant Mandel and offered to "make the case come out right." Counsel immediately advised the Court and the United States Attorney, and an investigation was initiated. A conference was held in Chambers on November 4, 1976, and counsel for the other defendants were informed of the attempt.

Later that day the Court issued a warrant for the arrest of the person suspected of making the tampering attempt, and he was apprehended by Government agents the following day. The suspect was held in custody until November 15, 1976, and during this time he made a statement that he had been hired to "throw a snag" in the case by generating adverse publicity. Defense counsel were not informed until December 2, 1976, of the arrest, confinement, interrogation and release of the suspect.

On November 30, 1976, a juror reported to the Court that prior to Thanksgiving Day he was approached by a third party with an offer to pay a sum of money for the purpose of influencing his vote. Counsel were informed of this incident at a conference held in Chambers later that day. After hearing the views of counsel, the Court excused the juror and adjourned the trial for the remainder of the day to permit the Government to initiate an investigation. Counsel again met with the Court in Chambers on December 1, 1976. Several motions for mistrial were made by defendants and were denied. Later that evening the news media began issuing reports of the jury tampering attempts. The jury was then sequestered at the request of the Government. Defense counsel were fully advised of the developments regarding sequestration.

The Court met with counsel on December 2, 1976, and motions for mistrial were renewed on the ground that, among other things, the jury would speculate on the absence of the excused juror, conclude that an approach had been made, and attribute the approach to the defendants. The Government then informed defendants for the first time that the person accused of the first jury tampering incident had been arrested, interrogated, confined and released, that his professed motive was to precipitate a mistrial, and that he possibly was acting in concert with other individuals.

The Court questioned the jury to determine if any of its members had been exposed to prejudicial publicity regarding the tampering attempts. Two alternate jurors were excused. The Court then ordered that the jury remain sequestered until further notice and that the trial resume on the morning of December 5, 1976.

Several incidents occurred during the sequestration period that significantly contributed to the declaration of a mistrial. On Friday evening, December 2, 1976, six jurors were sitting together in a game room at the hotel where they were sequestered

---

** The other defendants have joined in this motion.

when the following news bulletin appeared on a nearby television:

"Baltimore area man held in charges of jury tampering in the Mandel trial, and now reports of still another attempt."

A matron turned the television off, but not before a portion of the announcement was aired. The incident was reported to a supervising marshal, who then, without the knowledge or consent of the Court, interrogated each juror to determine the extent to which he or she had heard the announcement.

Proceedings were resumed on Monday, December 6, 1976, at which time motions for a mistrial were renewed by the defendants, and a motion to dismiss the indictment was made on the ground of prosecutorial misconduct. Defense counsel were then advised of the incident regarding the television news bulletin.

The Court interrogated the supervising marshal regarding sequestration procedures and examined the six jurors who had been in the room when the news bulletin was aired. The Court then heard oral arguments on the motions for mistrial. The motions were granted in an Order issued from the Bench on the following day.

An examination of the Court's order declaring a mistrial demonstrates that the mistrial was attributable to a number of factors, *all* of which the Court concluded required it "reluctantly [to] grant defendants' motions for mistrial." (Tr. 10026). In summary, the Court found that the absence of the excused juror would likely have been subject of speculation by the remaining jurors (Tr. 10022); that the remaining jurors may have been exposed to media accounts of the jury tampering attempts (Tr. 10022); that the interviews of the six jurors by the supervising marshal presented a serious problem "which might alone eliminate all six of the jurors interviewed" (Tr. 10022); that at least two of the jurors would have had to have been excused because of exposure to the news bulletin, leaving only twelve jurors (three of whom were under a doctor's supervision and one of whom had been admitted to the hospital the morning that the mistrial was declared) to sit at a trial that was expected to last five or six more weeks (Tr. 10023); that the security arrangements for the sequestration were inadequate and were likely to have resulted in the exposure of jurors to prejudicial publicity (Tr. 10024–25); and that shortening the trial to mitigate the problems caused by sequestration would have prejudiced the defendants by requiring them to present their proof more rapidly than the Government was required to present its proof (Tr. 10026).

The Double Jeopardy Clause of the Fifth Amendment protects criminal defendants from repeated prosecutions or multiple punishments for the same offense. *United States v. Dinitz,* 424 U.S. 600, 606, 96 S.Ct. 1075, 47 L.Ed.2d 267 (1975). It has long been recognized that "the State . . . should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty." *Green v. United States,* 355 U.S. 184, 187–88, 78 S.Ct. 221, 223, 2 L.Ed.2d 199 (1957). Moreover, an accused has a valued right to have his trial completed by a particular tribunal. *Wade v. Hunter,* 336 U.S. 684, 689, 69 S.Ct. 834, 837, 93 L.Ed. 974 (1949).

At the same time, however,

"[T]he double jeopardy provision of the Fifth Amendment . . . does not mean that every time a defendant is put to trial before a competent tribunal he is entitled to go free if the trial fails to end in a final judgment. Such a rule would create an insuperable obstacle to the administration of justice in many cases in which there is no semblance of the type of oppressive practices at which the double jeopardy provision is aimed.

\*　\*　\*　\*　\*　\*

[A] defendant's valued right to have his trial completed by a particular tribunal must in some circumstances be subor-

dinated to the public's interest in fair trials designed to end in just judgments." *Id.* at 688–89, 69 S.Ct. at 837.

In cases in which a mistrial is declared without the defendant's request or consent, the question of whether retrial is permitted is determined on the basis of whether retrial was dictated by "manifest necessity" or the "ends of public justice". *Illinois v. Somerville,* 410 U.S. 458, 461, 93 S.Ct. 1066, 35 L.Ed.2d 425 (1973). In the present case, however, the mistrial was declared upon the motion of the defendants. A defense motion for mistrial ordinarily removes any barriers to reprosecution, even when the defendant's motion is necessitated by prosecutorial or judicial error. *United States v. Jorn,* 400 U.S. 470, 485, 91 S.Ct. 547, 27 L.Ed.2d 543 (1971).

On the other hand, retrial is barred by the double jeopardy clause, irrespective of a defendant's motion for mistrial, in cases in which the mistrial is attributable to bad faith conduct on the part of the judge or prosecutor which amounts to over-reaching and "threatens the '[h]arassment of an accused by successive prosecutions or declaration of a mistrial so as to afford the prosecution a more favorable opportunity to convict' the defendant." *United States v. Dinitz, supra,* 424 U.S. at 611, 96 S.Ct. at 1081, *quoting from Downum v. United States,* 372 U.S. 734, at 736, 83 S.Ct. 1033, at 1034, 10 L.Ed.2d 100. Such conduct must have been motivated by bad faith "and designed to goad the [defendant] into requesting a mistrial or to prejudice his prospects for an acquittal" before reprosecution will be barred. *Id.*

The defendants' double jeopardy argument is based upon the premise that, had they been advised that the first suspect had been arrested and interrogated, they would have moved immediately for the sequestration of the jury and the events resulting in a mistrial would not have occurred. The "but for" theory relied upon by the defendants may be helpful in excluding causative factors, but it is by no means determinative of whether the mistrial can fairly be said to have been attributable to certain conduct.[3] It is true, as defendants contend, that the second jury tampering attempt may not have occurred had the jury been sequestered at an earlier date. But their theory becomes tenuous when their original premise is carried two steps further to say that "but for" the Government's nondisclosure of the arrest and interrogation of the first suspect, the mistrial would not have occurred.

The Court is of the opinion that the mistrial was not attributable to the actions of the Government. It is not disputed that the defendants were informed of the first jury tampering attempt immediately after it occurred, and no motion to sequester the jury was made at that time. There is no evidence, nor have counsel suggested, that the second attempt was factually related to the first attempt or perpetrated pursuant to a common scheme or design. Even if it could fairly be said, and we believe that it cannot, that the Government's conduct precipitated the second jury tampering attempt, it is clear that the second attempt was but one factor which, when considered with numerous other factors, resulted in the Court's decision to declare a mistrial. Indeed, the Court denied defense motions for a mistrial after the second attempt was made known to counsel on December 2, and the trial was scheduled to resume the following Monday. Finally, several of the incidents which led the Court to conclude that a mistrial was necessary occurred after the jury had been sequestered. The Court suggested in its order that the events that occurred and the situation that developed

**3.** Dean Prosser made the following observations about the "but for" rule of causation as it is applied in tort law:

"At most this must be a rule of exclusion . . . . It should be quite obvious that, once events are set in motion, there is, in terms of causation alone, no place to stop.

The event without millions of causes is inconceivable; and causation alone can provide no clue of any kind to singling out those [events] which are held to be legally responsible . . . .."

*W. Prosser, Law of Torts,* § 41, at 239 (4th Ed. 1971)

after sequestration may have been sufficient, in and of themselves, to warrant a mistrial. (Tr. 10026).

A second and equally important reason exists for denying the defendants' motion to dismiss the indictment on double jeopardy grounds. As has previously been discussed, the double jeopardy clause does not bar reprosecution when a motion for mistrial has been made by the defendant unless the mistrial was attributable to bad faith conduct or overreaching designed to prejudice the defendant's prospects for an acquittal or goad the defendant into requesting a mistrial. Even if it is assumed, for the sake of argument only, that the Government's delay in disclosing the arrest, interrogation, confinement and release of the first suspect brought about the mistrial, it cannot be said that the Government's actions in that regard were undertaken in bad faith or designed to prejudice the defendants.

■ The record shows that the Court requested the Government at the November 4 conference to confer with the Court "within the next few days" so that the Court could determine a course of action regarding the suspect "that [would] satisfy the interest of all in seeing that this trial is not aborted." Consultation occurred later that day and the Court issued a warrant for the immediate arrest of the suspect. By issuing the arrest warrant, the Court undoubtedly concluded that the immediate arrest of the suspect was the best course of

action to take. It is clear from the record that the decision not to disclose the arrest of the suspect to defense counsel was motivated by a desire to keep news of the tampering attempt away from the then unsequestered jury. The actions were undertaken by the Court and Government for the purpose of preserving the trial and preventing the jury from being tainted by prejudicial publicity. They were intended to enhance the defendants' prospects for a fair trial rather than to prejudice the defendants.[4] Defendants' motions to dismiss must accordingly be denied.

### Motions for Change of Venue

■ Defendants Hess and Harry Rodgers have moved under Rule 21(a), F.R. Crim.P.,[5] that the proceedings against them be transferred to any district outside the District of Maryland, except the District of the District of Columbia. The other defendants, with the exception of Mandel,[6] have adopted this motion. Defendants argue that because of undue publicity such a transfer is necessary in order for them to obtain a fair and impartial jury.[7]

Defendants have submitted to the Court numerous volumes of press clippings and radio and television transcripts, and point specifically to publicity regarding the jury tampering attempts and the post-trial release of transcripts concerning allegedly "sensitive matters."

■ Defendants must carry a heavy burden in moving for a change of venue

---

4. Defendants have pointed to several other incidents which they previously alleged amounted to prosecutorial misconduct, and have requested the Court to consider the "totality of the circumstances" in passing on the motions to dismiss. Judge Murray and Judge Pratt held that the previous charges of prosecutorial misconduct were without merit. The Court has considered the "totality of the circumstances" and is of the opinion that the record as a whole falls far short of demonstrating bad faith prosecutorial misconduct.

5. Rule 21(a) provides as follows:

"(a) For Prejudice in the District. The court upon motion of the defendant shall transfer the proceeding as to him to another district whether or not such district is specified in the defend-

ant's motion if the court is satisfied that there exists in the district where the prosecution is pending so great a prejudice against the defendant that he cannot obtain a fair and impartial trial at any place fixed by law for holding court in that district." (emphasis added)

6. A defendant has a constitutional right to be tried in the District where the offense is alleged to have been committed. See Sixth Amendment, U.S. Constitution.

7. Defendants Hess and Harry Rodgers have also asked for a severance on similar grounds. Their contentions concerning publicity and "guilt by association" were addressed by Judge Murray. See United States v. Mandel, 415 F.Supp. 1033, 1052 (D.Md.1976).

under Rule 21(a). As the rule provides, they must "satisfy" the Court that there is "so *great* a prejudice" against them that they "cannot obtain a fair and impartial trial." Transfer has been granted in only a few reported cases. *See C. Wright, Federal Courts* § 44 at 183 n. 5 (3d ed. 1976); 8A *J. Moore, Federal Practice* ¶ 21.03[1]–[3]. A change of venue is appropriate only for "exceptional cases." *See,* 1 *C. Wright, Federal Practice and Procedure* § 342 (1969).

The Court has confidence in the efficacy of voir dire examination as a protection against prejudicial publicity. By requesting a transfer now, rather than after voir dire examination, defendants contend that the publicity surrounding the previous trial was so "inherently prejudicial" as to render voir dire ineffective. Defendants principally rely upon *Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); *Estes v. Texas,* 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965); *Rideau v. Louisiana,* 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963); and *Irvin v. Dowd,* 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961).

In each of these cases, the Supreme Court overturned a state court conviction because of the effect of the news media and prejudicial publicity upon the impartiality of jurors. However, in only one of the cases, *Rideau v. Louisiana, supra,* did the Court hold that pretrial publicity *alone* necessitated a change of venue before voir dire. In *Rideau,* at least one-third, and possibly one-half, of the entire population of the district had seen shortly before trial a televised twenty-minute "interview" with the defendant in which he appeared "in jail, flanked by the sheriff and two state troopers, admitting in detail the commission of the robbery, kidnapping, and murder, in response to leading questions by the sheriff." 373 U.S. at 725, 83 S.Ct. at 1419. The Court presumed that, under these extreme circumstances, the pretrial publicity prejudiced the entire pool of prospective jurors to such an extent that an impartial jury could not have been empanelled, and that voir dire examination would have been ineffective.

In *Estes v. Texas, supra,* the existence of prejudice was again presumed, not on the basis of pretrial publicity, but rather, because the trial itself was conducted in an improper manner. The Court observed that the televising of a criminal trial was such an "untoward" practice as to be inherently prejudicial to the accused. Noting that it was departing from the usual approach of making a "careful examination of the facts . . . to determine whether prejudice resulted", the Court stated that when a practice "involves such a probability that prejudice will result", the existence of actual prejudice need not be considered. *Id.,* 381 U.S. at 542–43, 85 S.Ct. at 1633.

In *Sheppard v. Maxwell, supra,* the focus was again upon the circumstances in which the trial was conducted. Although the pretrial publicity in *Sheppard* was extensive and extremely inflammatory, the Court observed that "we cannot say that Sheppard was denied due process by the judge's refusal to take precautions against the influence of pretrial publicity alone. . . ." 384 U.S. at 354, 86 S.Ct. at 1518. The decisive factor in *Sheppard* was that "bedlam reigned at the courthouse and newsmen took over practically the entire courtroom." *Id.,* at 355, 86 S.Ct. at 1518. Although Justice Clark declined to reverse the conviction solely on the basis of pretrial publicity, he did address the question of when pretrial publicity requires the trial judge to take precautionary measures:

> "[W]here there is a reasonable likelihood that prejudicial news will prevent a fair trial, the judge should continue the case until the threat abates, or transfer it to another county not so permeated with publicity." *Id.,* at 363, 86 S.Ct. at 1522.

In a recent case, the Supreme Court noted that *Estes* and *Sheppard* are examples of totally improper courtroom proceedings. *See Murphy v. Florida,* 421 U.S. 794, 799, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975).

In *Irvin v. Dowd, supra,* the transcript of voir dire proceedings was examined to determine if the pretrial publicity resulted in actual prejudice to the jury pool. Justice Clark found that 370 prospective jurors,

almost ninety percent of those examined on the point, "entertained some opinion as to guilt—ranging in intensity from mere suspicion to absolute certainty." 366 U.S. at 727, 81 S.Ct. at 1645. Specifically, it was found that two-thirds of the twelve jurors selected believed before the trial that the defendant was guilty. Finding the existence of actual prejudice, the defendant's conviction was reversed.

■ Several important rules emerge from these cases. When the pretrial publicity, in and of itself, is extremely pervasive *and* incriminating, such as when a defendant's confession is televised to a substantial portion of prospective jurors, *see Rideau v. Louisiana, supra,* prejudice will be presumed, thereby rendering the remedial steps of voir dire and continuance ineffective. Prejudice will also be presumed when the trial itself is conducted in surroundings that are devoid of the solemnity and sobriety essential to the functioning of an impartial jury. *See Estes v. Texas, supra ; Sheppard v. Maxwell, supra.*

■ Absent extraordinary circumstances similar to those described in the above cases, the trial court will be compelled to transfer a case only when it finds actual prejudice (in voir dire) of the prospective jury pool to such an extent that it would be impossible to find an impartial jury panel. *See Irvin v. Dowd, supra.*

In a Memorandum Opinion issued on April 5, 1976, Judge Murray carefully reviewed the authorities of the Fourth Circuit Court of Appeals dealing with this subject. *United States v. Mandel,* 415 F.Supp. 1033, 1065–72 (D.Md.1976). His analysis applies with full force to the present motions and need not be restated here. Judge Murray concluded:

> "[T]he law in the Fourth Circuit is that a trial judge must first resort to voir dire before granting a change of venue, unless the publicity in the case is of a character that can be termed 'inherently prejudicial.'" *Id.* at 1069.

*See United States v. Jones,* 542 F.2d 186 (4th Cir. 1976); *United States v. Abbott*

*Laboratories,* 505 F.2d 565 (4th Cir. 1974), *cert. denied,* 420 U.S. 990, 95 S.Ct. 1424, 43 L.Ed.2d 67 (1975); *Wansley v. Slayton,* 487 F.2d 90 (4th Cir. 1973), *cert. denied,* 416 U.S. 994, 94 S.Ct. 2408, 40 L.Ed.2d 773 (1974); *United States v. Milanovich,* 303 F.2d 626 (4th Cir. 1962).

The newspaper clippings and television and radio transcripts filed by the defendants have been examined. Much of the publicity was simply straight-forward factual reporting, as distinguished from inflammatory publicity. Such a distinction is valid for our purposes. See *Beck v. Washington,* 369 U.S. 541, 82 S.Ct. 955, 8 L.Ed.2d 98 (1962). Of the publicity which amounts to more than factual reporting, some is favorable to the government and some is favorable to the defendants. If we focus only on the publicity which is unfavorable to the defendants, it pales by comparison to the pervasive and extremely incriminating confession of the defendant in *Rideau.* Similarly, the publicity fails to equal the vicious and inflammatory publicity in *Sheppard,* even though the publicity in *Sheppard* was insufficient to require a presumption that the entire jury pool was prejudiced.

■ The purpose of Rule 21(a) is to provide a means of protecting the constitutional right to a fair trial by permitting a court to transfer a case when there is a "reasonable likelihood" that an impartial jury cannot be found, *i.e.* when the publicity is "inherently prejudicial." The Court is of the opinion that this publicity is not "inherently prejudicial", and that through effective use of voir dire examination an impartial jury can be found to try this case.

As indicated in the previous Bench Memorandum, the motion to transfer must be denied.

■ Defendants have submitted the results of a public opinion poll in an attempt to demonstrate that actual prejudice exists among prospective jurors to such an extent that an impartial jury cannot be selected. The conclusions drawn in the poll appear to invade the province of the Court and are

based upon hearsay information.[8] In the opinion of the Court, a public opinion poll is no substitute for voir dire examination. *Cf. United States v. Partin*, 320 F.Supp. 275 (E.D.La.1970).

## ON MOTIONS OF DEFENDANTS

Having considered the briefs and arguments of counsel, the Court will now pass on the motions of the defendants.

The Government's motion for a prompt retrial will be considered at a later point in this Memorandum.

Joseph DePaul, Esquire, and Richard Sothoron, Esquire, have requested that they be relieved of their duties to represent defendant Ernest Cory during the retrial. This motion will not be passed upon until the Court hears from counsel after the trial date is set.

█ Attorneys for defendants have moved for an order directing the prosecution to strike the second sentence of paragraph 5 from its pleadings, entitled "Government's Request for a Prompt Retrial." The sentence reads as follows: "Shortly after the Government's case was completed, the defense began a concerted effort to have a mistrial declared."

The Government disavows any intention of imputing wrongdoing to defense counsel in connection with the jury tampering phase of the case. The disavowment of the Government is contained on page 5 of the Government's response to defendants' motion, which reads as follows: "Government counsel had, in fact, not asserted that defense counsel participated in the jury tampering attempts, but only that once the jury tampering occurred, defense counsel used the facts surrounding those attempts as a foundation for their repeated motions to have a mistrial declared."

Since the Government is not accusing counsel of any wrongdoing in connection with the alleged jury tampering, the motion to strike must be denied.

Defendants Mandel, Hess, William Rodgers and Harry Rodgers have renewed their motions for a judgment of acquittal. Judge Pratt denied these motions at the close of the Government's proof. He heard the evidence and was in a better position to rule on the motions than is the Court. Accordingly, it is ordered that the motions be, and the same hereby are, denied.

Defendant Cory has filed his fourth motion for severance. Three of these motions were denied by Judges Murray and Pratt, respectively. The fourth motion simply adopts the authorities and reasons stated in the first three. The rulings of Judge Murray and Judge Pratt are the law of the case. It is accordingly ordered that the motion be, and the same hereby is, denied.

The motion of defendant Cory for additional time in which to file pretrial motions is denied.

Defendant Mandel has filed a motion for determination as to the probable or likely effect of pretrial publicity and the scheduling of the trial in light thereof. The Court will explore this subject on voir dire examination, and after the exploration is complete, will make a judgment thereon.

█ Defendants Hess and Harry Rodgers have moved for a change of venue. A like motion was passed upon by both Judge Murray and Judge Pratt. The other defendants, with the exception of defendant Mandel, have joined in this motion. If defendant Mandel can get a fair trial in Maryland, we see no reason why movants cannot have a fair trial. The Court recognizes the rule that voir dire is not alone determinative of the question presented. However, voir dire is an important factor to be considered by the trial court in determining whether a change of venue should be granted. After voir dire is had, the Court will further consider the motions for change of

---

8. The poll attempts to show that a number of potential jurors in this District have formed an opinion about the guilt or innocence of the defendants. It concludes, among other things, that the effects of the publicity will dissipate significantly over a period of at least four to six months. Out of an abundance of precaution, the poll will not be released to the public until a verdict is rendered by the jury.

**102**

venue. In the meantime, the motions are denied.

 Defendant Mandel has renewed his motion to dismiss the indictment. This motion was previously denied by Judges Pratt and Murray. Defendant now contends that the Government has changed its theory since the decision of Judge Murray. Defendant claims that the Government originally relied upon bribery as a basis for its contention that defendant violated the mail fraud statute. According to defendant, the Government began to contend midway through the trial that the mail fraud charges in the case were not dependent upon proof of bribery, and that it was sufficient to establish a criminal scheme to defraud by demonstrating that defendant had failed to reveal financial dealings with persons doing business with the State. The Government denies that it has changed its theory, and contends that it has always relied upon the mail fraud statute as a basis for prosecution.

Defendants William and Harry Rodgers have moved to dismiss the indictment on the theory of double jeopardy. They contend that the Government is guilty of misconduct, and that such misconduct brings the double jeopardy clause into play. The basis of the claim is that the Government and Judge Pratt should have advised the defendants at an earlier date of the first jury tampering incident. The record shows that a hearing was held at which the attorneys for all defendants were advised of the alleged jury tampering. The facts do not appear to be in dispute. Having considered the matter, the Court is of the opinion that the double jeopardy clause does not bar reprosecution in this case.

Counsel for the Government and for the defendant Irvin Kovens have written letters to the Court. The Government counsel contend that Kovens should be tried at the same time the other defendants are tried, and counsel for Kovens contends that a severance was properly granted by Judge Pratt, and that Kovens should not be tried along with the other defendants.

The Court cannot intelligently pass on this motion unless and until it finds out if Kovens has regained his health to the extent that he is able to go to trial with the other defendants.

The Government's motion to consolidate Kovens' trial with the other defendants will be passed on if and when the Court finds out about the present condition of Kovens. If he is able to go to trial, he should go to trial with the other defendants. If he is unable to go to trial, he should not go to trial with the other defendants. If Kovens is found to be unable to go to trial with the other defendants, the motion of the Government will be denied; but if his health has changed so that he is now physically and mentally able to stand trial, then the Government's Motion to consolidate his case with the other defendants will be sustained.

The Maryland Legislature will be in session until April 11, 1977. The Court recognizes that some feel strongly that this case should be tried as soon as possible. However, the Court is of the opinion that it is not possible to try this case before the Legislature adjourns. Accordingly, the Court sets the retrial date for this case as April 13, 1977. Defendants' motions for continuance are granted to this extent.